**Mark BANASZAK, Appellant, Plaintiff Below,**

v.

**PROGRESSIVE DIRECT INSURANCE COMPANY, Appellee, Defendant Below.**

No. 536, 2009.

Supreme Court of Delaware.

Submitted: June 2, 2010.
Decided: Aug. 31, 2010.
Corrected: Sept. 3, 2010.

Beverly L. Bove and Vincent J.X. Hedrick (argued), II, Law Office of Beverly Bove, Wilmington, Delaware, for appellant.

Michael C. Rosendorf, Stanton, Delaware. Pro hac vice: Angus R. Everton (argued), Morgan Carlo Downs & Everton PA, Hunt Valley, Maryland, for appellee.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice:

In this appeal, Mark Banaszak seeks reversal of a trial judge's decision to grant in part and deny in part his motion for

summary judgment. Banaszak contends that Progressive failed to offer him underinsured motorist coverage pursuant to 18 *Del. C.* § 3902(b) and seeks to reform his insurance policy up to the $100,000 limit of his "liability" or bodily injury coverage (BI). He contends that the trial court erred when it ruled that § 3902(a) applied instead of § 3902(b), and that he was only permitted to reform his policy in order to provide him with the minimum underinsured motorist coverage of $15,000. Because Progressive cannot demonstrate a meaningful offer of underinsured motorist coverage pursuant to § 3902(b), we RE-VERSE in part and AFFIRM in part.

## Factual and Procedural Background

*Banaszak Purchases Progressive Motorcycle Insurance*

In 2005, Mark Banaszak completed an online application to receive information regarding Progressive Direct Motorcycle Insurance. After he completed the online application, Banaszak called Progressive stating that he was "interesting in getting a quote and possibly getting some motorcycle insurance." Banaszak spoke with an insurance agent named Mike, who was able to pull up the information from Banaszak's online application. The following exchange took place:

*Mike:* Okay. So you do have your bodily injury, guest passenger liability set at $15,000 per person up to $30,000 per accident.

*Banaszak:* Right

*Mike:* And up to $10,000 of property damage liability.

*Banaszak:* Okay.

*Mike:* There is no uninsured motorist or uninsured motorist property damage selected.

*Banaszak:* Okay.

*Mike:* Last time you did the quote. But you have personal injury protection, which is required in Delaware, $15,000

per person not to exceed $30,000 per accident, which is unrestricted.

*Banaszak:* Right.

*Mike:* Okay. You're just going to go with comprehensive and collision?

*Banaszak:* From what I remember, yeah.

*Mike:* Yeah. No problem.

There was no additional mention of uninsured or underinsured coverage, with the exception of Mike's statement that "I think if it was 100, 300 for liability [instead of 15, 30] and keeping everything else the same like personal injury protection, uninsured and everything ....the premium difference would only be like 33 bucks for the year." Mike confirmed that the coverage would go into effect "as of midnight tonight" (July 2, 2005); Banaszak then made a down payment on the insurance by giving Mike his credit card information. Mike informed Banaszak that Progressive would mail him a package containing all of the information regarding his insurance policy in the coming days: "review the checklist that we provide to you ... a few items need to be signed or copies of, so make sure when you review all of that, sign it, send back all of the required information just to avoid any increases. That's all."

*Banaszak Receives the Progressive packet; Signs and Returns all Documents*

The Progressive package contained pre-filled and pre-checked documents:

(1) In the section summarizing Banaszak's coverage, the columns for "Uninsured/Underinsured Motorist Bodily Injury" and "Uninsured Motorist Property Damage" are both marked as "Rejected."

(2) A statement on the page informing Banaszak to sign the enclosed forms to avoid a policy cancellation reads:

"Your application indicates that you did not select Uninsured/Underin-

sured Motorist coverage. Because this coverage was not selected, the policyholder must sign the enclosed coverage rejection form. If this signed form is not returned, Uninsured/Underinsured Motorist coverage will be added to your policy."

(3) A statement on one of the following pages defining UM/UIM coverage.

The subsequent paragraph reads:

"By law, your motor vehicle insurance policy must provide Uninsured Motorist Coverage with minimum limits of $15,000 for bodily injury or death each person/$30,000 bodily injury or death each accident/$10,000 property damage each accident. Additional limits of coverage are available for a modest increase in premium. You may purchase additional limits of Uninsured/Underinsured Motorist Coverage up to limits selected for your Liability Coverage."

(4) In a table representing Banaszak's desired insurance coverage, a box marked "to reject this Coverage entirely" is checked in the row corresponding to "Uninsured/Underinsured vehicle coverage (Optional) (Available in limits)."

(5) Banaszak signed a page labeled "Rejection of Uninsured/Underinsured Motorist Coverage." The initial paragraph reads "I have been offered Uninsured/Underinsured Motorist Coverage up to an amount equal to the limits of my Liability Coverage and I reject the option to purchase any Uninsured/Underinsured Motorist Coverage." The page then summarizes the benefits of UM/UIM, and states that the signatory disclaims these benefits.

*Banaszak's Motorcycle Accident and Subsequent Litigation*

On May 26, 2007, an underinsured motorist failed to stop at a red light and struck Banaszak. Banaszak's damages resulting from the accident exceed the $100,000 liability limits of his Progressive Direct Policy and surpass the tortfeasor's minimum amount of coverage. Banaszak filed this action seeking to reform his insurance policy to increase his UM/UIM coverage up to the limits of his $100,000 liability or BI coverage. Banaszak and Progressive filed cross-motions for summary judgment. The trial judge ruled that further discovery was necessary, and denied both motions with leave to refile for summary judgment at the conclusion of discovery. Specifically, the trial judge requested that Progressive track down the initial electronic communications between Banaszak and Progressive.

In the second round of summary judgment motions, Progressive renewed its motion for summary judgment while Banaszak filed his own motion seeking relief. Although Progressive was unable to find the online communications, it provided an audiotape of the conversation between the Progressive agent and Banaszak on July 1, 2005. After reviewing a transcript of the conversation, the trial judge ruled that Progressive did not clearly explain that uninsured coverage would be provided to Banaszak, unless rejected in writing. The trial judge granted Banaszak's motion in part and allowed Banaszak to reform his policy to reflect the minimum uninsured motorist coverage of $15,000.

Both parties agree that there are no genuine issues of material fact.[1]

### Standard of Review

 "Judicial construction of a statute is a determination of law and the appropri-

1. *Id.* at 10.

ate standard of review is *de novo.*"[2] Therefore, we will determine whether the trial court "erred in formulating or applying legal precepts."[3]

## Discussion

The analysis of this case highlights the differences between §§ 3902(a) and 3902(b), and hinges on which subsection applies. Title Eighteen, Section 3902 of the Delaware Code provides that:

(a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued for delivery ... unless coverage is provided therein or supplemental thereto for the protection of persons ... who are legally entitled to recover damages from owners or operators of uninsured ... vehicles for bodily injury ... or personal property damage resulting from the ownership, maintenance or use of such uninsured ... vehicle.

(1) No such coverage shall be required in or supplemental to a policy when rejected in writing, on a form furnished by the insurer or group of affiliated insurers describing the coverage being rejected, by an insured named therein.... The coverage herein required may be referred to as uninsured vehicle coverage.

(b) Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $100,000 per person and $300,000 per accident or $300,000 single limit, but not to exceed the limits for bodily injury liability set forth in the basic policy. Such additional insurance shall include underinsured bodily injury liability coverage.

Banaszak contends that Progressive failed to meet the "adequate and meaningful" requirement of 18 *Del. C.* § 3902(b) by failing to communicate a clear offer of additional underinsured motorist coverage. Relying on *State Farm v. Arms*, Banaszak contends that when an insurer does not meet its obligation to make an affirmative offer of additional coverage under § 3902(b), "the insurer is deemed to have made a continuing offer of additional coverage ... [and] the offer remains open even after the accident occurs."[4] Banaszak submits that we should reform the policy to increase his underinsured coverage to match his bodily injury liability coverage of $100,000.

In response to Banaszak's contentions, Progressive asserts that this case falls within the purview of § 3902(a), not § 3902(b). Particularly, Progressive claims that § 3902(a)(1) states that no uninsured coverage shall be required in or supplemental to a policy when rejected in writing, on a form furnished by the insurer describing the coverage being rejected. Because Banaszak confirmed that he rejected uninsured coverage in its entirety when he signed and mailed a policy document entitled "Rejection of Uninsured/Underinsured Motorist Coverage," Progressive asserts that Banaszak waived his rights to underinsured coverage and reformation of the policy is inappropriate.[5]

2. *Colonial Ins. Co. of Wisconsin v. Ayers*, 772 A.2d 177 (Del.2001); *Humm v. Aetna Cas. & Sur. Co.*, 656 A.2d 712 (Del.1995); *State Farm Mut. Auto. Ins. Co. v. Clarendon Nat'l Ins. Co.*, 604 A.2d 384 (Del.1992).

3. *State Farm Mut. Auto. Ins. Co.*, 604 A.2d at 387 (quoting *Hudson v. State Farm Mut. Ins. Co.*, 569 A.2d 1168, 1170 (Del.1990)).

4. *Arms*, 477 A.2d at 1064.

5. Progressive further contends that the trial judge erroneously reformed Banaszak's policy

 In *Humm*, we recognized that § 3902(a) and § 3902(b) set forth different legal standards for the sale and purchase of uninsured motorist coverage and underinsured motorist coverage. The purpose of § 3902(a) is to ensure that any individual who does not expressly reject uninsured coverage will "be assured of the same minimum pool of resources from which to seek compensation" from an uninsured motorist as he would have from a motorist with the state's minimum insurance coverage.[6] Meanwhile, § 3902(b) serves as "a disclosure mechanism [that] promote[s] informed decisions on automobile insurance coverage."[7]

 A plain reading of the two subsections suggests that the insurer must (1) not deliver any insurance policy without the minimum uninsured coverage, unless rejected by the insured in writing; and must (2) make a meaningful offer supplying the insured with supplemental UM/UIM coverage up to the limits of an insured's bodily injury liability insurance. Although the language of § 3902(a)(1), "[n]o such coverage shall be required in or supplemental to a policy when rejected in writing ...." may suggest that an insured's initial rejection of uninsured coverage will not necessitate a later offer of underinsured motorist coverage pursuant

to § 3902(b), nothing in the statute suggests that §§ 3902(a) and 3902(b) are dependent on one another or that one subsection is a prerequisite for the other.[8]

 An insurer has the obligation, pursuant to the individual standards set forth in § 3902(a) and § 3902(b), to include the minimum uninsured motorist coverage in the policy, unless explicitly rejected by the insured, and alert the insured that he may purchase supplemental underinsured motorist coverage. An offer form pre-filled by Progressive's agents—albeit signed, dated, and returned by Banaszak—failed to embody those standards.

We have recognized that the insurance industry employs "[i]ts own obscure terminology, which, despite efforts toward plain language policies, is nevertheless difficult for the typical consumer to understand fully."[9] Progressive's use of a pre-checked document denies Banaszak the chance to personally select or reject UM/UIM coverage and deprives him of the opportunity to seek further explanation from the insurer, an agent, or any person well-versed in the terms of art of the insurance industry. By burying the policy information in pre-checked and pre-completed forms, Progressive contravenes the intent of the legislature to ensure that

---

to include uninsured motorist coverage. Relying primarily on *Lawrence v. Simmons*, 889 A.2d 283 (Del.2005) and *Hercules, Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1277 (Del.2000), Banaszak claims that Progressive's request for affirmative relief must be addressed in a cross-appeal. Because Progressive failed to file a timely cross-appeal, Banaszak moves to strike Progressive's second argument. We find Banaszak's position more persuasive. In *Hercules*, we observed that an appellee may defend a final judgment in his favor on appeal but may not enlarge its own rights or lessen the rights of the appellant. Here, Progressive seeks to challenge the trial judge's decision to reform Banaszak's insurance policy when the only issue on appeal is the amount of the reformation. Because Progressive failed to file

a cross-appeal challenging the reformation itself, we decline to address Progressive's second contention.

6. *Humm*, 656 A.2d at 716.

7. *Arms*, 477 A.2d at 1064.

8. "The Courts may not engraft upon a statute language which has been clearly excluded therefrom by the legislature." *Humm*, 656 A.2d at 715 (explaining that § 3902(a) and (b) are not to be construed as dependant on one another since nothing in the language of the statutes suggests otherwise).

9. *Arms*, 477 A.2d at 1065.

consumers are able to make an informed decision.

 To honor the legislative intent and to fulfill the obligations of § 3902 by providing a disclosure mechanism for informed insurance decisions,[10] the insured must know "[a]ll of the facts reasonably necessary for a person to be adequately informed to make a rational, knowledgeable and meaningful determination."[11] Without understanding what uninsured or underinsured motorist coverage entails, Banaszak did not have all of the pertinent facts and could not make an informed decision on automobile insurance coverage.

As the trial judge aptly observed, "[p]rogressive's package did not accurately and forthrightly explain the consequences of Banaszak's signature on the dotted line." This is due largely to the nebulous circumstances surrounding what Progressive offered Banaszak when he filled out the initial quote application online, as well as what Progressive offered during Banaszak's telephone conversation with "Mike" the insurance agent. Not only has Progressive failed to provide any documentation of the electronic communications made to Banaszak when he filled out his initial application for a quote in June, 2005, but also the transcript of the telephone conversation between the insurance agent and Banaszak on July 1, 2005 does not mention underinsured motorist coverage. Thus, Progressive has failed to demonstrate that it offered Banaszak underinsured motorist coverage, and therefore cannot satisfy the requirements of § 3902(b).

### CONCLUSION

Because § 3902(b) mandates that an insurer offer its customers additional underinsured motorist coverage up to the insured's bodily injury liability limits, we reverse and remand with instruction to reform Banaszak's policy to increase his underinsured coverage to $100,000 in order to match his bodily injury liability limits. We affirm the judgment granting Banaszak summary judgment on this uninsured claim.

---

10. *Arms*, 477 A.2d at 1064.

11. *Morris v. Allstate Ins. Co.*, 1984 WL 3641, 1984 Del.Super. LEXIS 806 (Del.Super.Ct. July 10, 1984); *See Patilla v. Aetna Life & Cas. Co. v. The Ins. Market*, 1993 Del.Super. LEXIS 161 (Del.Super.Ct. April 22, 1993).